**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 13-2459

RAFAEL TISCARENO-GARCIA,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: October 30, 2014                  Decided: March 3, 2015

Amended: March 6, 2015

Before TRAXLER, Chief Judge, and KING and THACKER, Circuit Judges.

Petition for review denied in part and dismissed in part by published opinion. Chief Judge Traxler wrote the opinion, in which Judge King and Judge Thacker joined.

**ARGUED:** Martin M. Rosenbluth, LAW OFFICES OF MARTIN ROSENBLUTH, Burlington, North Carolina; Derrick J. Hensley, LAW OFFICE OF DERRICK J. HENSLEY, Durham, North Carolina, for Petitioner. John William Blakeley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Stuart F. Delery, Assistant Attorney General, Civil Division, Erica Miles, Senior Litigation Counsel, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

TRAXLER, Chief Judge:

Rafael Tiscareno-Garcia petitions for review of an order of removal of the Board of Immigration Appeals ("BIA") which determined that Tiscareno-Garcia cannot establish the good moral character required to apply for cancellation of removal, see 8 U.S.C. § 1229b(b)(1)(B), as a result of his serving 181 days in jail for an illegal-entry conviction, see 8 U.S.C. § 1101(f)(7). We deny the petition in part and dismiss it in part.

                                I.

Tiscareno-Garcia is a Mexican national. Between March 8, 1999, and November 3, 2000, border patrol agents apprehended Tiscareno-Garcia three times for being present in the United States illegally; each time he was permitted to return voluntarily to Mexico. Not long after his last arrest, Tiscareno-Garcia illegally entered the United States again without inspection. This time, however, he was able to make his way up to Raleigh, North Carolina, where he avoided apprehension for 10 years.

On November 15, 2010, agents from the Immigration and Customs Enforcement ("ICE") division of the Department of Homeland Security ("DHS") arrested Tiscareno-Garcia during a workplace raid and charged him with illegal entry in violation of 8 U.S.C. § 1325(a), a misdemeanor offense that carries a

2

sentence of "not more than 6 months" imprisonment. In March 2011, Tiscareno-Garcia pled guilty and served 181 days.

DHS served Tiscareno-Garcia with a Notice to Appear ("NTA") before he went to jail, charging that he was subject to removal as a result of entering "without being admitted or paroled." 8 U.S.C. § 1182(a)(6)(A)(i); see 8 U.S.C. § 1227(a)(1). After Tiscareno-Garcia had served his sentence and was released, DHS commenced removal proceedings against him.

Tiscareno-Garcia conceded removability and applied for cancellation of removal. He argued that his removal would cause "exceptional and extremely unusual hardship" to his three citizen children, especially his 10-year-old autistic son. And, except for the fact that he entered the United States illegally a decade before, Tiscareno-Garcia appears to have been a law-abiding member of society and a devoted father and provider for his children.

The government, however, moved to "pretermit" Tiscareno-Garcia's application, arguing that his 181 days of confinement barred him from establishing "good moral character" under § 1101(f)(7). In response, Tiscareno-Garcia argued that the crime he was incarcerated for—illegal entry under § 1325(a)—is a misdemeanor offense that does not constitute a crime of moral turpitude, and therefore should not be used to defeat a showing of "good moral character." Moreover, he argued that in making

3

cancellation of removal available to aliens who are present illegally (either because they entered illegally or because they violated the terms of their stay after being legally admitted), Congress assumed that those applying for relief would be guilty of illegal entry and therefore could not have meant to bar aliens from applying for relief based on a § 1325(a) conviction.

The IJ agreed with the government that Tiscareno-Garcia was statutorily ineligible for cancellation of removal and dismissed Tiscareno-Garcia's application. The IJ found that § 1101(f)(7) plainly and unambiguously precludes an alien from establishing good moral character based on the length of incarceration, not the type of offense. The IJ also found that the statutory scheme, according to the plain language, was coherent and not absurd. The IJ noted that the statute enumerates certain types of offenses (regardless of the resulting time served) that categorically bar a finding of good moral character but that illegal entry is not included in this list. The IJ observed that § 1101(f)(7) is a catch-all for any other offense, regardless of type, that resulted in 180 days or more of confinement. The IJ concluded that illegal entry under § 1325(a) would fall under this provision only if the alien served enough time and noted that illegal entry is not a crime that would render an alien per se ineligible for cancellation of removal.

The BIA affirmed, concluding that the Agency is bound by the plain language of the text. Relying on the plain language of the statute, the BIA agreed with the IJ that the applicability of § 1101(f)(7) does not depend upon the type of offense, and that Tiscareno-Garcia was precluded from establishing good moral character and, as a result, that he was ineligible for cancellation of removal.

II.

In interpreting statutes, we must first determine legislative intent. See Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43. Tiscareno-Garcia concedes that § 1101(f)(7) is clear and unambiguous, and he does not disagree that a literal application of the statute precludes him from being "regarded as, or found to be, a person of good moral character," which, in turn, renders him ineligible to apply for cancellation of removal under § 1229b(b). But he thinks that it is an absurd result where aliens are barred from applying for cancellation of removal based on an illegal entry conviction-the same illegal entry that rendered the alien removable and necessitated applying for cancellation of removal in the first place. Tiscareno-Garcia asserts that Congress

could not have intended to offer the hope of relief with one hand and pull it back with the other, and he argues that we are therefore not bound by the clear and unambiguous language of the statute.

It is true that in "exceptionally rare" instances where "a literal reading of a statute produces an outcome that is demonstrably at odds with clearly expressed congressional intent to the contrary, or results in an outcome that can truly be characterized as absurd, i.e., that is so gross as to shock the general moral or common sense," Sigmon Coal Co. v. Apfel, 226 F.3d 291, 304 (4th Cir. 2000) (citations and internal quotation marks omitted), aff'd sub nom. Barnhart v. Sigmon Coal Co., 534 U.S. 438, 442 (2002), we can look past the statute's plain and ordinary meaning, see Crooks v. Harrelson, 282 U.S. 55, 60 (1930) (explaining that a court will "override the literal terms of a statute only under rare and exceptional circumstances" when application of the literal terms produces an "absurdity . . . so gross as to shock the general moral or common sense"). As this court has noted previously, however, "we are more than a little hesitant to abandon the presumption that Congress meant what it said, or did not say, when the words of a statute are plain," Sigmon Coal, 226 F.3d at 305, in view of the fact that "the sole function of the courts is to enforce [the relevant statute]

6

according to its terms," Caminetti v. United States, 242 U.S. 470, 485 (1917).

Tiscareno-Garcia urges us to conclude that this is one of those "exceptionally rare" instances in which the literal application of a Congressional enactment produces truly absurd results. His absurdity argument distills to this: Because Congress clearly intended to make relief available under § 1229b(b) to persons who entered the United States illegally in violation of § 1325(a), precluding an alien from applying for relief based solely on an illegal entry conviction under § 1325(a) "directly contradicts" Congressional intent. Tiscareno-Garcia submits that "virtually all" nonpermanent resident applicants for cancellation of removal could be charged with and convicted of illegal entry under federal law, which would make any relief from removal offered under § 1229b(b) illusory. Tiscareno-Garcia contends that to avoid such an absurd result, the court must read an exception into sections 1229b(b)(1)(B) and § 1101(f)(7) for any person who was confined as a result of a conviction under § 1325(a).

Tiscareno-Garcia has fallen far short of demonstrating a truly absurd result here—one so preposterous that it "shock[s] the general moral or common sense." Crooks, 282 U.S. at 60. The result compelled by the plain language is clearly not absurd. Read together, sections 1229b(b) and 1101(f) present a

7

coherent scheme that reasonably affords the discretionary immigration benefit of cancellation of removal to some nonpermanent residents but not to others. Under § 1101(f), Congress delineated a number of categories that, if applicable, bar an alien from establishing his "good moral character" including some based on conduct that is antithetical to "good moral character," see, e.g., 8 U.S.C. § 1101(f)(1) ("habitual drunkard[s]"); 8 U.S.C. § 1101(f)(4) ("one whose income is derived principally from illegal gambling activities"), and others based on the fact of a conviction for a serious offense or a crime involving moral turpitude, regardless of time actually served, see 8 U.S.C. §§ 1101(f)(3) & (8). Another category—the one into which Tiscareno-Garcia falls—uses the amount of time confined in jail rather than the nature of the offense to establish conclusively a lack of good moral character. See id. § 1101(f)(7). It is entirely sensible for Congress to have concluded that persons who have been convicted of crimes serious enough to warrant at least 180 days or longer in jail lack the good moral character required for discretionary relief from removal. See Romero-Ochoa v. Holder, 712 F.3d 1328, 1331 (9th Cir. 2013). In using the length of incarceration "as a proxy for seriousness," Congress reasonably incorporated "the adjudicating forum's judgment concerning the seriousness of an

offense." Id. at 1332 (internal quotation marks and alteration omitted).

Tiscareno-Garcia's absurdity argument largely ignores this scheme and proceeds as if aliens convicted of illegal entry are categorically barred from seeking cancellation of removal. Obviously, this is not the case. Not every non-permanent alien who is removable entered illegally; many were lawfully admitted but later found themselves in unlawful status after violating the terms of a visa. Not every alien who enters the United States without inspection faces prosecution under § 1325(a); indeed, the vast majority do not. And, not every illegal alien who is convicted under § 1325(a) receives the maximum sentence of 180 days.

We conclude that there are plausible reasons for Congress to have excluded from discretionary relief aliens who served 6 months for violating § 1325(a). Plausibility is all that is required for us to reject the argument that the perfectly clear and unambiguous statutory language produces an absurd result. See Sigmon Coal, 226 F.3d at 308; In re: Sunterra Corp., 361 F.3d 257, 268 (4th Cir. 2004) ("[I]f it is plausible that Congress intended the result compelled by the Plain Meaning Rule, we must reject an assertion that such an application is absurd."). Because this is not an exceptionally rare case, we

9

cannot say that adherence to the statute's plain text would be absurd.

## III.

In order to establish eligibility for cancellation of removal, an applicant must show that he "has been physically present in the United States for a continuous period of not less than 10 years," 8 U.S.C. § 1229b(b)(1)(A), and that he "has been a person of good moral character during such [10-year] period," 8 U.S.C. § 1229b(b)(1)(B). Tiscareno-Garcia argues that the 10-year period for establishing good moral character ends "when the alien is served a notice to appear." 8 U.S.C. § 1229b(d)(1)(A). Because he began and completed his period of confinement after DHS served the notice to appear, Tiscareno-Garcia urges the court to conclude that he did not serve his imprisonment during the 10-year period and therefore is not precluded from establishing good moral character. See 8 U.S.C. § 1101(f)(7) ("No person shall be regarded as, or found to be, a person of good moral character who, during the period for which good moral character is required to be established, is, or was . . . confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more . . . ." (emphasis added)). We note that Tiscareno-Garcia's position appears to conflict with the BIA's position on this issue. See Matter of Ortega-Cabrera, 23 I. & N. Dec. 793, 798 (BIA 2005)

10

(concluding that "the 10-year period during which good moral character must be established ends with the entry of a final administrative decision").  As explained below, however, this court lacks jurisdiction to address the merits of this issue because Tiscareno-Garcia failed to raise it before the BIA and therefore failed to exhaust his administrative remedies.

Federal appellate courts are vested with jurisdiction to review "final order[s] of removal," 8 U.S.C. § 1252(a)(1), which "are entered only after all administrative remedies have been exhausted," Huaman-Cornelio v. BIA, 979 F.2d 995, 999 (4th Cir. 1992); see 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies available to the alien as of right . . .").  And, as the government suggests, an alien who does not raise a particular claim before the BIA fails to exhaust his administrative remedies as to that claim.  When that occurs, the federal courts lack jurisdiction to consider it.  See Cordova v. Holder, 759 F.3d 332, 336 n.2 (4th Cir. 2014); Massis v. Mukasey, 549 F.3d 631, 638 (4th Cir. 2008).

Whether Tiscareno-Garcia ever made this particular argument to the agency is not a matter of dispute—he clearly did not. Instead, Tiscareno-Garcia claims that he was unable to raise this issue because, despite repeated requests, the government did not provide his attorney with a copy of the NTA until after

11

the BIA had entered a final order of removal. According to Tiscareno-Garcia, the NTA was the only document showing that the NTA was served before he went to jail. Therefore, he contends that he did not have the ability to present this challenge to the BIA.

We do not find Tiscareno-Garcia's argument to be convincing. At the initial removal hearing before an IJ on September 28, 2011, counsel for Tiscareno-Garcia noted that he had not seen the NTA. The IJ explained that the NTA charged Tiscareno-Garcia as removable because he had entered without inspection in violation of § 1182(a)(6)(A)(i), and the IJ subsequently marked the NTA as Exhibit 1. Tiscareno-Garcia then conceded removability but indicated he intended to seek cancellation of removal. When the government pointed out that his 181-day stint in jail rendered him ineligible for cancellation of removal, the IJ directed counsel for Tiscareno-Garcia to file a memorandum showing why Tiscareno-Garcia was not ineligible under the "good moral character" provision set forth in § 1101(f).

As directed, Tiscareno-Garcia filed a memorandum on December 21, 2011, setting forth reasons why his jail term did not make him ineligible to apply for cancellation of removal, but he did not argue that the 10-year good moral character period ended with the issuance of the NTA and therefore did not

12

include the 181 days of confinement. At the very latest, Tiscareno-Garcia and his lawyer received a copy of the NTA on September 28, 2011, when it was entered as an exhibit during the initial hearing. Clearly, Tiscareno-Garcia could have raised this claim before both the IJ and the BIA; the government's failure to provide a copy of the NTA prior to that time presented no impediment to his ability to exhaust his claim administratively. Accordingly, we lack jurisdiction over this claim and, technically speaking, must dismiss it.

IV.

Finally, Tiscareno-Garcia includes on appeal a claim that the combined effect of the statutory provisions at issue here—sections 1229b(b)(1), 1101(f)(7) and 1325(a)—deprived him of due process. This challenge is without merit, and we reject it.

"To succeed on a due process claim in an asylum or deportation proceeding, the alien must establish two closely linked elements: (1) that a defect in the proceeding rendered it fundamentally unfair and (2) that the defect prejudiced the outcome of the case." Anim v. Mukasey, 535 F.3d 243, 256 (4th Cir. 2008). Tiscareno-Garcia posits that the federal district court which accepted his guilty plea and imposed the 180-day sentence actually exercised "de jure jurisdiction" over his eligibility for cancellation of removal that is reserved for the immigration courts. He reasons that he therefore did not

13

receive a meaningful opportunity during removal proceedings to establish his eligibility for discretionary relief. The die was cast, in other words, by the time his case reached the IJ.

Tiscareno-Garcia does not actually claim any procedural defect occurring in the removal proceeding itself. Actually, this is simply another way to challenge the statute's eligibility bar for those who are confined for 180 days as a result of an illegal-entry conviction. The district court obviously did not exercise any sort of "jurisdictional" authority over the administrative removal process. What happens in criminal proceedings, whether federal or state, commonly echoes in immigration proceedings.[*]

V.

For the foregoing reasons, we deny in part and dismiss in part Tiscareno-Garcia's petition for review.

<u>PETITION FOR REVIEW DENIED IN PART</u>
<u>AND DISMISSED IN PART</u>

---

[*] Likewise, to the extent that Tiscareno-Garcia raises a due process challenge based on the DHS's discretion to both charge him with illegal entry under § 1325(a) and then place him in removal proceedings, we reject his claim as wholly without merit.

14